IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EDITH BORAN, O.B.O. | ) | CASE NO. 1:10CV1751 |
| S.B., a minor, | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE LESLEY WELLS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Edith Boran ("Plaintiff"), as the grandmother and legal guardian of S.B., a minor,

("Claimant"), seeks judicial review of the final decision of Defendant, Michael J. Astrue,

Commissioner of Social Security (the "Commissioner"), denying Claimant's application for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §

1381 et seq. (the "Act").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This matter has been referred to the undersigned Magistrate Judge for a Report and

Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons set forth below, the final decision of the Commissioner should be

REVERSED and REMANDED.

## I.  Procedural History

On July 16, 2008, an application for SSI was protectively filed on behalf of Claimant for

suicide attempts, bipolar disorder, learning disabilities, and anger problems.  Tr. 80-83, 195.  The

application alleged a disability onset date of September 1, 2001.  Tr. 80-83, 195.  The claim was

denied initially on August 19, 2008 (Tr. 55), and upon reconsideration on November 12, 2008.

Tr. 56.  On December 1, 2008, Plaintiff timely filed a written request for a hearing (Tr. 65), and,

on June 24, 2009, a hearing was held before Administrative Law Judge O. Price Dodson (the

"ALJ").  Tr. 25-54.  In a decision dated July 31, 2009, the ALJ determined that Claimant was not

disabled or entitled to SSI benefits.  Tr. 9-23.  Plaintiff requested review of this decision by the

Appeals Council.  Tr. 8.  On June 10, 2010, the Appeals Council denied review, making the

ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

On August 10, 2010, Plaintiff filed this action on behalf of Claimant seeking review of the

Commissioner's decision.  Doc. 1.  On June 21, 2011, the Commissioner filed his Brief on the

Merits.  Doc. 17.  On August 27, 2011, Plaintiff filed her Brief on the Merits.  Doc. 21-1.  On

September 30, 2011, the Commissioner filed a Reply Brief.  Doc. 22.

## II.  Evidence

### A.    Personal and Vocational Evidence

Claimant was born on February 3, 1995.  Tr. 8.  The ALJ determined that Claimant was a

school-age child on the date of her application for SSI and an adolescent on the date of the

hearing.  Tr. 19.  Claimant has never engaged in substantial gainful activity.

### B.    Medical Evidence[1]

As noted by the ALJ in his decision, Claimant has had a fairly tragic life.  Tr. 16.  Her

father committed suicide when Claimant was eight months old and her mother committed suicide

when Claimant was two years old.  Tr. 195, 398, 403, 421, 541.  In addition, Claimant's step-

grandfather sexually abused her when she was ten years old.  Tr. 16, 516, 665.  Claimant has been

hospitalized several times for suicide attempts and has received extensive therapy as a result.  Tr.

398, 403, 445, 447, 449.

---

[1]  Plaintiff's brief focuses primarily on Claimant's mental health impairments.  Therefore, this Report & Recommendation also focuses on Claimant's medical history as it relates to her mental health impairments.

1.      **Treating Physician**

      a.      **Prior to SSI Application Date of July 16, 2008**

Claimant sought treatment from Jayant Choure, M.D., a psychiatrist, for her mental health issues.  The record includes treatment notes from Dr. Choure for the period August 2007 to April 2009.  In a treatment note dated August 21, 2007, Plaintiff reported to Dr. Choure that Claimant had a long history of behavioral problems and that she was hospitalized twice in the past.  Tr. 761.  Dr. Choure found that Claimant was alert and oriented and her cooperation was okay.  Tr. 761.  Claimant denied any auditory or visual hallucinations, or paranoid intent.  Tr. 761.  Her insight and judgment were poor but she denied any suicidal or homicidal ideation.  Tr. 761.

In a treatment note dated September 26, 2007, Dr. Choure noted that Claimant had an anger outburst a few days before, and that she put a phone cord around her neck in an attempt to commit suicide.  Tr. 749.  Claimant reported to Dr. Choure that she put the phone cord around her neck because she was angry with Plaintiff.  Tr. 749.  Dr. Choure examined Claimant and found that she was alert and oriented and had good cooperation.  Tr. 749.  Her insight and judgment were okay and she denied any suicidal or homicidal ideation.  Tr. 749.   She also denied any auditory or visual hallucinations, or paranoid ideation.  Tr. 749.

On October 10, 2007, Claimant reported to Dr. Choure that she was doing okay on medication and that her grades were improving.  Tr. 748.  Plaintiff reported to Dr. Choure that Claimant's behavior at home was improving, and that Claimant was catching up with her school work.  Tr. 748.  On exam, Dr. Choure found that Claimant was alert and oriented and that her cooperation was okay.  Tr. 748.  Her insight was poor and judgment was okay and she denied any suicidal or homicidal ideation.  Tr. 749.   She also denied any auditory or visual hallucinations.  Tr. 749.

On October 29, 2007, Dr. Choure noted that Claimant was taking Fluoxetine, Seroquel, and Adderall XR regularly and that she was doing very well.  Tr. 746.  Claimant denied any episodes of cutting herself and denied any side effects due to medication.  Tr. 746.  Plaintiff reported to Dr. Choure that she has noticed a significant improvement in Claimant's behavior, and that Claimant was doing fairly well.  Tr. 746.  Dr. Choure examined Claimant and found that she was alert and oriented, had good cooperation, and that her mood was euphoric.  Tr. 746.  Her insight and judgment was fair and she denied any suicidal or homicidal ideation.  Tr. 746.

On November 29, 2007, Plaintiff reported to Dr. Choure that Claimant was making progress in school and that her behavior at home was improving.  Tr. 744.  Plaintiff stated that Claimant still had some anger outbursts, but the intensity and frequency of the outbursts were much less as compared to the past.  Tr. 744.  On exam, Dr. Choure found that Claimant was alert and oriented, had good cooperation, and had euphoric mood.  Tr. 744.  He found that Claimant's insight and judgment were okay and that she denied any suicidal or homicidal ideation.  Tr. 705.

In a progress note dated December 26, 2007, Dr. Choure noted that Claimant had an anger outburst a few days before because she stole money from Plaintiff.  Tr. 741.  When Plaintiff confronted Claimant, she became very upset and attempted to overdose on medication.  Tr. 741.  Plaintiff called 911 and Claimant was taken to the emergency room, and was later hospitalized.  Tr. 741.  Claimant reported to Dr. Choure that she took the medication because she was angry with Plaintiff.  Tr. 741.  Dr. Choure found that Claimant was alert and oriented and that her cooperation was okay.  Tr. 741.  Her insight was okay and her judgment was poor and she denied any suicidal or homicidal ideations.  Tr. 741.  She also denied any auditory or visual hallucinations, or paranoid ideations.  Tr. 741.

On March 27, 2008, Claimant informed Dr. Choure that she was doing fairly well in school.  Tr. 724.  She also denied any thoughts of hurting herself or anyone else.  Tr. 724.  In

4

addition, Plaintiff reported to Dr. Choure that Claimant was doing fairly well, and that she did not notice any self-harming behavior.  Tr. 724.  Dr. Choure examined Claimant and found that she was alert and oriented, had good cooperation, and had a euphoric mood.  Tr. 724.  Her insight and judgment were okay and she denied any suicidal or homicidal ideation.  Tr. 724.

On June 4, 2008, Plaintiff reported to Dr. Choure that Clamant was still having mood swings and that she gets easily irritable and frustrated.  Tr. 715.  Plaintiff also stated that Claimant had frequent outbursts and that Plaintiff had to call the police a few weeks ago because Claimant had an anger outburst.  Tr. 715.  Dr. Choure found that Claimant was alert and oriented and that her cooperation was "all right."  Tr. 715.  Her insight and judgment were poor but she denied any suicidal or homicidal ideation.  Tr. 715.  Dr. Choure diagnosed Claimant with ADHD and mood disorder not otherwise specified ("NOS"), and ruled out bipolar disorder NOS.  Tr. 715.

In a treatment note dated June 26, 2008, Plaintiff reported to Dr. Choure that Claimant had stolen Plaintiff's credit card and purchased something online.  Tr. 710.  Plaintiff called the police because of this incident.  Tr. 710.  Plaintiff also stated that she did not notice any self-harming behavior.  Tr. 710.  Dr. Choure found that Claimant was alert and oriented, that her cooperation was okay, and that her affect was restricted.  Tr. 710.  Her insight and judgment were poor but she denied any suicidal or homicidal ideation.  Tr. 710.

On July 2, 2008, Plaintiff reported to Dr. Choure that she took Claimant to the emergency room because Claimant threatened to hurt herself.  Tr. 706.  Claimant informed Dr. Choure that she had not meant to hurt herself, but threatened to do so because she was angry with her brother.  Tr. 706.  Dr. Choure examined Claimant and found that she was alert and oriented, had good cooperation, and had euphoric mood.  Tr. 706.  Although her insight and judgment were poor, she denied any suicidal or homicidal ideation.  Tr. 706.

On July 15, 2008, Claimant reported to Dr. Choure that she and her brother and Plaintiff went on vacation to Chicago and had a really good time. Tr. 705. In addition, Plaintiff informed Dr. Choure that Claimant was doing much better. Tr. 705. On exam, Dr. Choure found that Claimant was alert and oriented and had euphoric mood. Tr. 705. He found that Claimant's insight and judgment were okay and that she denied any suicidal or homicidal ideation. Tr. 705.

### b. After SSI Application Date of July 16, 2008

On July 30, 2008, Plaintiff reported to Dr. Choure that Claimant was doing fairly well. Tr. 700. Plaintiff stated that Claimant still had anger outbursts, but the intensity and frequency were much less as compared to the past. Tr. 700. Plaintiff also denied noticing any self-harming behavior. Tr. 700. On exam, Dr. Choure found that Claimant was alert and oriented and had euphoric mood. Tr. 700. He found that Claimant's insight and judgment were fair and that she denied any suicidal or homicidal ideation. Tr. 700.

On August 25, 2008, Claimant informed Dr. Choure that school was going to start the next day and she was really excited to go. Tr. 692. She reported sleeping well and eating well. Tr. 692. On examination, Dr. Choure found that Claimant had good cooperation, that her mood was euphoric, and that her affect was congruent with her mood. Tr. 692. Her insight and judgment were fair and she denied suicidal or homicidal ideation. Tr. 692.

On September 11, 2008, Plaintiff reported to Dr. Choure that Claimant had another anger outburst and was getting fidgety and impulsive at school. Tr. 686. Claimant informed Dr. Choure that she was sleeping and eating well and denied any suicidal or homicidal ideation. Tr. 686. On exam, Dr. Choure found that Claimant was alert and oriented and her cooperation was much better in the office. Tr. 686. Although her insight and judgment were poor, her mood was euphoric and her affect was congruent with her mood. Tr. 686.

On October 21, 2008, Claimant told Dr. Choure that she did "good" in school in the morning, but sometimes felt restless and got distracted in the afternoon. Tr. 674. She denied any suicidal or homicidal ideation. Tr. 674. Plaintiff informed Dr. Choure that Claimant was charged with unruly behavior a few weeks earlier, but had been doing fairly well since then. Tr. 674. Plaintiff denied noticing any self-harming behavior. Tr. 674. On exam, Claimant was alert and oriented, her cooperation was okay, and her eye contact was "all right." Tr. 674. Her insight and judgment were poor but she denied auditory or visual hallucination or paranoid ideation and her speech rate and tone were normal. Tr. 674.

In a treatment note dated March 17, 2009, Dr. Choure noted that Claimant had been given detention because she put soap all over the school bathroom. Tr. 848. Claimant informed Dr. Choure that she did not know why she vandalized the bathroom. Tr. 848. Plaintiff reported to Dr. Choure that she did not notice any self-harming behavior. Dr. Choure found that Claimant was alert and oriented, her cooperation was "all right," and Claimant said she was fine. Tr. 848. Her insight was okay and judgment was poor but she denied any suicidal or homicidal ideation. Tr. 848.

On April 13, 2009, Dr. Choure completed a form captioned "Diagnosis of Mental Impairments" for ADHD. Tr. 832-33. Dr. Choure opined that Claimant had marked inattention, impulsiveness, and hyperactivity, resulting in marked impairment in age-appropriate social functioning and marked difficulties in concentration, persistence, or pace. Tr. 832-33.

### 2.    Reviewing Psychologist

On August 18, 2008, state agency reviewing psychologist Patricia Semmelman, Ph.D., completed a Childhood Disability Evaluation Form. Tr. 582-587. Dr. Semmelman found that Claimant's impairments did not meet, medically equal, or functionally equal the listings. Tr. 582-83. In the domain of Acquiring and Using Information, Dr. Semmelman found no limitation. Tr.

584.  In the domain of Attending and Completing Tasks, Dr. Semmelman found less than marked limitation.  In reaching this conclusion, Dr. Semmelman noted that, although Claimant was diagnosed with ADHD, this domain appears to be affected more by her behavior.  Tr. 584.  In the domain of Interacting and Relating with Others, Dr. Semmelman opined that Claimant had marked limitation.  Tr. 584.  In the domain of Moving About and Manipulating Objects, Dr. Semmelman found no limitation.  Tr. 585.  In the domain of Caring for Youself, Dr. Semmelman found no limitation.  Tr. 585.  In the domain of Health and Physical Well-Being, Dr. Semmelman found no limitation.  Tr. 585.

In a case analysis dated August 18, 2008, Dr. Semmelman noted that Claimant's school records did not reflect Claimant having extreme behavioral issues.  Tr. 588.  She also noted that Claimant was noted to be quiet and followed directions when observed.  Tr. 588.  She opined that Claimant's anger appeared to be more directed at her grandmother and brother.  Tr. 588.

### 3. Case Managers

#### a. Ms. Engelmann

Cheryl Engelmann, a Family Preservation Specialist for the Blair Foundation, was Claimant's case manager for one year and four months.  Tr. 367-68.  During that time, Ms. Engelmann met with Claimant once per week and took detailed notes during those sessions.  Tr. 367, 615-699.  On March 27, 2009, Ms. Engelmann provided an assessment of Claimant's mental health in a form captioned "Questionnaire – Mental/Emotional by Third Party."  Tr. 367-68.  Ms. Engelmann indicated that she had observed Claimant exhibit thoughts of suicide.  Tr. 367.  She also stated that she had personally witnessed Claimant explode into rage.   Tr. 368.  In addition, Ms. Engelmann noted that Claimant avoids situations that increase her anxiety, such as gym class.  Tr. 368.  She further stated that the negative behavior Claimant exhibits are attempts to alleviate her anxieties.  Tr. 368.  Ms. Engelmann found that Claimant's activities of daily living were

8

mildly restricted by her mental issues.  Tr. 368.  In addition, Ms. Engelmann found that Claimant had marked difficulty in maintaining social functioning and in interacting appropriately with the general public.  Tr. 368.

        **b.**    **Ms. Pustotnik**

Alice Pustotnik was Claimant's second case manager.[2]  Tr. 369-70.  Tr. 777-830.  She treated Claimant two times per week and took detailed notes of her sessions.  Tr. 369, 777-830. Ms. Pustotnik assessed Claimant's mental health in a form captioned "Questionnaire – Mental/Emotional by Third Party" dated March 16, 2009.  Tr. 369-70.  Ms. Pustotnik stated that she personally witnessed Claimant's inappropriate verbal communication with her peers, family, and adults, as well as her extreme fear and anger.  Tr. 370.  She further stated that she personally heard Claimant's suicide threats and witnessed Claimant's violent acts against her brother.  Tr. 370.  In assessing Claimant's limitations, Ms. Pustotnik found that Claimant's activities of daily living were moderately restricted by her mental issues.  Tr. 370.  She also found that Claimant had extreme difficulty in maintaining social functioning and interacting appropriately with the general public.  Tr. 370.

**C.**    **School Records**

In March 2002, Elizabeth Lenzy, a school psychologist, administered the Wechsler Intelligence Scale for Children III ("WISC-III").  Tr. 161.  Claimant received a Verbal IQ score of 87, a Performance IQ score of 110, and a Full Scale IQ score of 97, placing her within the average range.  Tr. 161.  Ms. Lenzy noted that approximately fifty percent of youths the same age as Claimant at the time the test was administered fell within this range.  Tr. 161.

---

[2] It is unclear how long Ms. Pustotnik treated Claimant.  The record includes treatment notes from Ms. Pustotnik for the period of September 2008 to February 2009.  Tr. 777-830.

In December 2007, Claimant was referred to Eileen McClure, a school psychologist, for an evaluation to see if her "emotional problems are interfering with school learning." Tr. 143-44. Ms. McClure noted that Claimant did not display negative behaviors at school but at home she could be challenging to handle. Tr. 143. Ms. McClure also administered the Wechsler Intelligence Scale for Children IV ("WISC-IV"). Tr. 150. Claimant received a Verbal Comprehension IQ score of 99, a Perceptual Reasoning IQ of 84, and a Full Scale IQ score of 89, which was in the low-average range. Tr. 150-51.

On August 5, 2008, when Claimant was in 8th grade, John Mikas, her Math and Language Arts teacher, completed a Teacher Questionnaire regarding Claimant's overall functioning. Tr. 208-15. In the area of Acquiring and Using Information, he noted that Claimant had information acquisition problems as well as information retention issues and that she constantly looked to others for assistance. Tr. 209. Mr. Mikas found that Claimant had a very serious problem comprehending and doing math problems and obvious problems comprehending oral instructions, reading and comprehending written material, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions. Tr. 209. He found that Claimant had only a slight problem understanding vocabulary, understanding and participating in class discussions, providing organized and oral explanations and adequate descriptions, and expressing ideas in written form. Tr. 209.

In the area of Attending and Completing Tasks, Mr. Mikas found that Claimant had problems with organizing her things or school work, and completing work accurately without careless mistakes. Tr. 210. He noted that Claimant was showing signs of improvement in most areas and that organization and accuracy weaknesses seemed to compound each other. Tr. 210. In the area of Interacting and Relating with Others, Mr. Mikas reported that Claimant had an obvious problem making friends, but otherwise had only slight or no problems . Tr. 211. He

noted most of Claimant's problems occurred outside of school.  Tr. 211.  In the area of Moving

About and Manipulating objects, Mr. Mikas found no problems.  Tr. 212.  In the area of Caring

for Herself, Mr. Mikas noted that Claimant received counseling outside of school with various

agencies.  Tr. 213.  Finally, in the area of Health and Physical Well-Being, Mr. Mikas noted that

Claimant was taking various medications to control her emotional issues.  Tr. 214.

On February 3, 2009, Mr. Mikas completed another Teacher Questionnaire regarding

Claimant's functioning.  Tr. 346-53.  In the area of Acquiring and Using Information, he noted

that Claimant had a serious problem understanding and participating in class discussions,

providing organized oral explanations, applying problem-solving skills in class discussions, and

obvious problem recalling and applying previously learned materials.  Tr. 347.  However, he

found that Claimant had only a slight problem comprehending oral instructions, understanding

vocabulary, reading and comprehending written material, comprehending and doing math

problems, expressing ideas in written form, and learning new material.  Tr. 347.  In the area of

Attending and Completing Tasks, Mr. Mikas found that Claimant had obvious problems

regarding sustaining attention during activities, carrying out multi-step instructions, and

completing work accurately without careless mistakes.  Tr. 348.  He otherwise found only slight

or no problems.  Tr. 348.

In the area of Interacting and Relating with Others, Mr. Mikas found that she had some

obvious and serious problems, but also that she had only slight problems in playing cooperatively

with other children, making and keeping friends, seeking attention appropriately, asking

permission appropriately, following rules, respecting/obeying adults in authority, taking turns in a

conversation, and interpreting the meaning of facial expressions.  Tr. 349.  In the area of Moving

About and Manipulating Objects, Mr. Mikas found no problems.  Tr. 350.  In the area of Caring

for Herself, Mr. Mikas found that Claimant had a serious problem knowing when to ask for help

and obvious problems in some areas.  Tr. 351.  He also found that she had only a slight problem being patient when necessary and using appropriate coping skills and no problem taking care of her personal hygiene and caring for her physical needs.  Tr. 351.  In the area of Health and Physical Well-Being, Mr. Mikas noted that Claimant takes medication.  Tr. 352.

**D.  Testimonial Evidence**

**1.  Claimant's Testimony**

On June 24, 2009, Claimant and Plaintiff appeared with counsel and testified at the administrative hearing.  Tr. 25.  She testified that she was going into the ninth grade and had done "pretty good" in school that last year, receiving As, Bs, C's, and an F in gym class.  Tr. 30. Claimant stated that she did not take gym class because people called her names and she found it "not interesting" and, as a result, she failed the class.  Tr. 33.  Claimant also stated that she sometimes got into fights with classmates because they called her names.  Tr. 33.  She testified that she had not received any suspensions or referrals.  Tr. 30.

Claimant also stated that she watched television and that she had friends with whom she talked.  Tr. 31.  She testified that she also liked to ride her bike, play computer games, and play with her dog.  Tr. 35-36.  Claimant reported that she took medication for ADHD and had no side effects.  Tr. 32.  She stated that she fought with her grandmother and brother three times a week. Tr. 33.  When asked why she got into fights with her grandmother, Claimant responded that they fought about clothes, food, and friends.  Tr. 35.  Claimant testified that she tried to hurt herself a year ago and cut herself three months earlier.  Tr. 35.  She stated that she saw a counselor once a week.  Tr. 35.

**2.  Plaintiff's Testimony**

Plaintiff testified that she is Claimant's biological grandmother and has been Claimant's legal guardian since Claimant was two and a half years old.  Tr. 38.  Plaintiff stated that Claimant

started attending counseling at age five because she would run away, not listen, throw tantrums, throw things, break things, and try to hurt her brother.  Tr. 39.  Once or twice a week, Claimant still throws a tantrum and will run away.  Tr. 39-40.  Plaintiff testified that Claimant screams and swears often, which is her regular behavior, as opposed to a tantrum.  Tr. 40.  If she has a tantrum, Plaintiff stated that Claimant wants to hurt or kill someone.  Tr. 40.

Plaintiff stated that Claimant has also attempted to hurt Plaintiff.  Tr. 42.  Plaintiff stated that medication helped Claimant by keeping her "more mellow" and not wanting to fight, but that Claimant occasionally skipped taking her medication.  Tr. 42-43.  She testified that Claimant had a history of cutting herself with the metal part of the eraser on a pencil.  Tr. 48.  Plaintiff also testified that Claimant tried to hang herself in the last year.  Tr. 49-50.  Plaintiff stated that Claimant admitting stealing from her, although she had not caught her.  Tr. 52.

E.    **Other Evidence**

Plaintiff called the police on several occasions because of arguments she had with Claimant.  Tr. 91-99.  For example, on February 9, 2007, a police officer responded to a complaint that Claimant was unruly.  Tr. 98.  Claimant and her grandmother had been in an argument because Claimant did not want to take gym class.  Tr. 99.  The officer reported that no assault took place and the complaint was "handled without incident."  Tr. 99.

On May 18, 2007, a police officer responded to a complaint that Claimant was unruly.  Tr. 97.  The officer reported that Claimant had pushed her grandmother, and had broken several things in the home.  Tr. 97.  The officer reported that while he was preparing Plaintiff's statement, Claimant became very vulgar and unruly.  Tr. 97.  After struggling with her for a few minutes, the officer placed Claimant in handcuffs and arrested her for domestic violence.  Tr. 97.  Claimant was charged with and pleaded "true" to being unruly.  Tr. 100.  She was placed on supervised probation and house arrest, during which time Magistrate Edith Hough found that Claimant had

13

"done very well" and she was "very well behaved at school."  Tr. 103.  The supervised probation

was terminated on February 11, 2008.  Tr. 103.

### III.  Standard for Disability

A child is considered disabled if she has a "medically determinable physical or mental

impairment that results in marked and severe functional limitations and can be expected to result

in death or has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 1382c(a)(3)(C); *see also Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F.

App'x 146, 147 (6th Cir. 2002).  To determine whether a child is disabled, the regulations

prescribe a three-step sequential evaluation process.  20 C.F.R. § 416.924(a).  At step one, a child

must not be engaged in "substantial gainful activity."  20 C.F.R. § 416.924(b).  At step two, a

child must suffer from a "severe impairment."  20 C.F.R. § 416.924(c).  At step three, disability

will be found if a child has an impairment, or combination of impairments, that meets, medically

equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20

C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the listings, the

Commissioner will assess the functional limitations caused by the impairment.  20 C.F.R. §

416.926a(a).  The Commissioner will consider how a child functions in six domains: (1) acquiring

and using information; (2) attending and completing tasks; (3) interacting and relating with

others; (4) moving about and manipulating objects; (5) caring for herself; and (6) health and

physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi).  The regulations state that an impairment

functionally equals the listings if it the child has an "extreme" limitation in one domain[3] or a

---

[3] An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).  An "extreme" limitation means "more than marked." *Id.*  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean."  *Id.*

"marked" limitation in two domains.[4]

## IV.  The ALJ's Decision

The ALJ denied benefits in a decision dated July 22, 2008.  Tr. 16-29.  He determined that Claimant had not engaged in substantial gainful activity during the relevant time frame.  Tr. 15. The ALJ found that Claimant had the following severe impairments: Bipolar Disorder and Attention Deficit Hyperactivity Disorder ("ADHD").  Tr. 15.  The ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled an impairment described in the listing of impairments (20 C.F.R. pt. 404, Subpt. P , App. 1).  Tr. 15-16.  The ALJ then determined that Claimant did not have an impairment or combination of impairments that functionally equaled an impairment included in the listed impairments.  Tr. 16-23.  In reaching this conclusion, the ALJ evaluated Claimant's abilities under all six domains of functioning and made the following findings:

Domain 1:     Less than marked limitation in "acquiring and using information."  Tr. 18.

Domain 2:     Less than marked limitation in "attending and completing tasks."  Tr. 19.

Domain 3:     Marked limitation in "interacting and relating with others."  Tr. 20.

Domain 4:     No limitation in "moving about and manipulating objects."  Tr. 21.

Domain 5:     Less than marked limitation in "ability to care for herself."  Tr. 22.

Domain 6:     No limitation is "health and physical well-being."  Tr. 23.

Therefore, the ALJ determined that Claimant was not disabled or eligible for SSI.  Tr. 23.

---

[4] A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(i).  A "marked" limitation is "more than moderate" but "less than extreme."  *Id.*  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean."  *Id.*

## V.  Arguments of the Parties

First, Plaintiff argues that the ALJ erred in evaluating the opinions of Dr. Choure, Claimant's treating physician, and Ms. Pustotnik and Ms. Engelmann, Claimant's mental health case managers.  Second, Plaintiff asserts the ALJ erred in failing to take into account the multitude of intensive psychiatric supports required by Claimant in order to stabilize her fragile mental state and moderate her symptoms and limitations.  Third, Plaintiff argues the ALJ erred in failing to consider all of the evidence of record, as well as Claimant's longitudinal history, in determining the level of limitation she has in the domains of acquiring and using information, caring for herself, and health and physical well-being.

In response, the Commissioner asserts the ALJ properly evaluated all of the evidence from medical sources and non-medical sources.  The Commissioner also argues the ALJ conducted a full and complete review of the record and explained how the evidence supported his decision to deny benefits.  Finally, the Commissioner argues that substantial evidence supports the ALJ's determination of the level of limitation Claimant has in the domains of acquiring and using information, caring for herself, and health and physical well-being.

## VI.  Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  The substantial evidence standard requires a court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, __ F.3d __, 2011 U.S. App. LEXIS 19392, at *10 (6th Cir. Sept. 22, 2011), citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  A court cannot reverse the decision of

an ALJ, even if substantial evidence exists in the record that would have supported an opposite

conclusion, so long as substantial evidence supports the ALJ's conclusion.  *Walters v. Comm'r of*

*Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  However, an "ALJ's failure to follow agency rules

and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may

be justified based upon the record."  *Cole*, __ F.3d __, 2011 U.S. App. LEXIS 19392, at *10

(citing *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009)).

**A.      Medical Source Opinions**

> **1.      The ALJ Properly Followed the Treating Physician Rule in Evaluating the
>          Opinion of Dr. Choure**

Plaintiff argues that the ALJ failed to follow the treating physician rule in evaluating the

opinion of Claimant's treating physician, Dr. Jayant Choure.  Dr. Choure completed a "Diagnosis

of Mental Impairments" form, finding that Claimant had marked inattention, impulsiveness, and

hyperactivity, resulting in marked impairment in age-appropriate social functioning and marked

difficulties in concentration, persistence, or pace.  Tr. 832-33.  The ALJ determined that Dr.

Choure's opinion should be given little weight because his opinion was inconsistent with the

evidence as a whole, as well as being inconsistent with his own treatment notes.

Under the treating physician rule, an ALJ must give the opinion of a treating source

controlling weight if he finds the opinion well-supported by medically acceptable clinical and

laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the

case record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§

404.1527(d)(2), 416.927(d)(2).  If an ALJ decides to give a treating source's opinion less than

controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make

clear to any subsequent reviewers the weight given to the treating physician's opinion and the

reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must

consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors which tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d), 416.927(d). Clear articulation of how the treating physician rule is applied allows a claimant to understand the rationale for the Commissioner's decision and it allows for meaningful review of the ALJ's application of the treating physician rule.  *See Rogers*, 486 F.3d at 242-243.

Here, the ALJ explicitly considered Dr. Choure's opinion and determined that it was entitled to little weight.  Tr. 17.  In reaching this decision, the ALJ explained that Dr. Choure's opinion was inconsistent with the evidence as a whole, as well as with his own notes.  Tr. 17.  The ALJ's explanation demonstrates that he properly discounted Dr. Choure's opinion under the factors of supportability and consistency.  Thus, the ALJ stated good reasons for discounting the opinion of Dr. Choure and complied with agency regulations.  *See, e.g., Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (finding that an ALJ provided good reasons for discounting treating physician opinion where the ALJ's stated reason was brief but reached several of the factors an ALJ must consider when determining what weight to give non-controlling opinion).

A review of the record also reveals that the reasons provided by the ALJ for discounting Dr. Choure's opinion are supported by substantial evidence.  In his treatment notes, Dr. Choure consistently found that Claimant was alert and oriented, that her mood was euphoric and her affect was congruent with her mood, and that she denied suicidal or homicidal ideation.  Tr. 706, 692, 686, 674.  Her cooperation was usually good and at least "okay."  Tr. 706, 692, 686, 674. Although Plaintiff reported on July 2, 2008, two weeks before the application date, that she had

18

threatened to hurt herself, Claimant stated that she had not meant to hurt herself, but said those things because she was angry with her brother.  Tr. 706.  By July 15, 2008, Plaintiff reported that Claimant was doing much better.  Tr. 705.  In addition, on July 30, 2008, Plaintiff reported that Claimant was doing fairly well.  Tr. 700.  She reported that although Claimant still had anger outbursts, the intensity and frequency was much less as compared to the past.  Tr. 700.  She also denied noticing any self-harming behavior.  Tr. 700.

On August 25, 2008, Claimant reported being really excited about starting school and reported sleeping well and eating well, and denied any suicidal or homicidal ideation.  Tr. 692. On September 11, 2008, although Claimant had another anger outburst and was getting fidgeting and impulsive at school, Claimant reported that she was sleeping and eating well and denied suicidal or homicidal ideation.  Tr. 686.  Again, Dr. Choure found Claimant was alert and oriented, that her cooperation was much better, and that her mood was euphoric.  Tr. 686.  On October 21, 2008, Claimant stated that she did "good" in school in the morning, but sometimes felt restless and got distracted in the afternoon.  Tr. 674.  She denied any suicidal or homicidal ideation.  Tr. 674.  This evidence supports the ALJ's conclusion that Dr. Choure's opinions regarding Claimant's mental limitations are inconsistent with his own treatment notes.

The ALJ also reasonably found that Dr. Choure's opinion was inconsistent with other evidence in the record.  Tr. 17.  For example, although Claimant had difficulty with math at school, she tested in the low average to average range in intelligence.  Tr. 17, 151, 161.  In addition, Claimant was described as quiet, reluctant to raise her hand, or speak out without being called on (Tr. 17, 337), which was inconsistent with Dr. Choure's opinion that she had marked inattention, impulsiveness, and hyperactivity.  Tr. 832-33.  Further, Magistrate Hough noted that Claimant was very well behaved at school.  Tr. 103.

Based on the foregoing, the ALJ reasonably discounted Dr. Choure's opinion of marked limitations. *See Foster v. Halter*, 279 F.3d 348, 356 (6th Cir. 2001) (ALJ reasonably declined to give significant weight to treating psychologist's questionnaire findings that were unexplained, inconsistent with source's narrative report, and not supported by medical or clinical findings); *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 988-89 (6th Cir. 2009) (unpublished opinion) (ALJ reasonably rejected treating psychiatrist's mental impairment questionnaire where responses were contrary to other substantial evidence, including psychiatrist's own treatment notes that suggested ongoing improvement).

Plaintiff argues the ALJ erred in citing one isolated treatment note (a note dated August 25, 2008) as an example of Claimant's condition because other evidence demonstrates that Claimant's "improvement was short lived." Plaintiff essentially accuses the ALJ of cherry picking a treatment note that portrays Claimant's condition in a positive light, while ignoring more troubling aspects of Claimants condition, such as her anger outbursts and bad behavior at home and at school. As noted by the Sixth Circuit, the so-called cherry picking of evidence by the ALJ "can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citation omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* at 773 (citations omitted). As discussed above, the example cited by the ALJ in his decision is consistent with Dr. Choure's other treatment notes. The ALJ applied the correct legal standard in assessing Dr. Choure's opinion and his decision to attribute less weight to Dr. Choure's opinion is supported by substantial evidence. Accordingly, the ALJ properly

followed the treating physician rule in evaluating the opinion of Dr. Choure.[5]

### 2. The ALJ Did Not Properly Evaluate the Opinions of Ms. Pustotnik and Ms. Engelmann

Plaintiff also argues the ALJ erred in evaluating the opinions of Ms. Pustotnik and Ms. Engelmann, Claimant's mental health case managers. Doc. 21-1, p. 6. Specifically, Plaintiff contends that the ALJ failed to follow Social Security Ruling ("SSR") 06-03p because the ALJ only cited to these opinions in a parenthetical and did not explain what consideration or weight he gave the opinions. Doc. 21-1, p. 6.[6] In response, the Commissioner argues the ALJ was not required to discuss the opinions of the case managers because they are "other sources" under the regulations. Doc. 22, pp. 2-3. Defendants contend that all the ALJ was required to do was consider these opinions, which he did, as evidenced by the fact that he cited the opinions in the parenthetical. Doc. 22, pp. 2-3.

The Commissioner correctly notes that a case manager is not an "acceptable medical source" that is entitled to "controlling weight." *See* 20 C.F.R. §§ 404.1527(a)(2); 404.1527(d), 416.927(a)(2), 416.927(d). However, the ALJ must consider all of the available evidence in the individual's case record, including information from "other sources." SSR 06-03p, 2006 SSR

---

[5] Plaintiff also argues the opinions of Ms. Pustotnik and Ms. Engelmann, Claimant's mental health case managers, corroborate the opinion of Dr. Choure. Doc. 22, p. 6. Plaintiff then asserts the ALJ failed to follow SSR 06-03p because he did not explain what consideration or weight he gave these opinions. With regard to the first argument, even if it is true that the opinions of the case managers corroborate Dr. Choure's opinion, it is also true that substantial evidence supports the ALJ's decision not to give controlling weight to Dr. Choure's opinion. Thus, Plaintiff's argument on this point is without merit. This Report and Recommendation will address Plaintiff's second argument – that the ALJ failed to comply with SSR-06-03p – in the next section.

[6] Both Plaintiff and the Commissioner assert that the ALJ cited to the opinions of Ms. Pustotnik and Ms. Engelmann in a parenthetical on page 3 of his decision in support of his statement that Claimant's "parents committed suicide when she was just three months old and her step grandfather sexually abused her at 10." Tr. 16-17. Ms. Engelmann's assessment was marked as Exhibit 23E and Ms. Pustotnik's assessment was marked as Exhibit 24E. Tr. 367-370. However, on page 3, the ALJ cites to Exhibit 23E and Exhibit 24F (Psychiatric records from Windsor Laurelwood Hospital). It is unclear if the ALJ made a typographical error in citing to Exhibit 24F instead of 24E, or if he truly meant to cite to Exhibit 24F (which also supports his statement concerning the suicides of Claimant's parents). Because of this uncertainty, this Report & Recommendation will address the evaluation of the opinions of Ms. Engelmann and Ms. Pustotnik based on the arguments of the parties that both of these opinions were cited by the ALJ in his decision.

LEXIS 5.  Case managers are considered "other sources" whose opinions may be used as evidence to show the severity of a claimant's impairments and, if the claimant is a child, how the claimant typically functions compared to children of the same age who do not have impairments. *See* 20 C.F.R. §§ 404.1513(d), 416.913(d).  SSR 06-03p clarifies how the ALJ should evaluate the opinions and other evidence from "other sources" and states:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as ... licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.  Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other evidence in the file.

SSR 06-03p, 2006 SSR LEXIS 5 at *8.  Further, SSR 06-03p, explains that opinions from non-medical sources who, in their professional capacity, have seen the claimant should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion.  SSR 06-03p, 2006 SSR LEXIS 5, at *14;  *see also  Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (citations omitted).  Finally, the Ruling states that:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity.  Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

2006 SSR LEXIS 5 at *15-16. *See also Cruse*, 502 F.3d at 541-42 (noting that the ALJ should have provided some basis as to why he was rejecting the opinion of an "other source"); *Patterson*

22

*v. Astrue*, Case No. 5:09-cv-1566, 2010 U.S. Dist. LEXIS 54062 (N.D. Ohio June 2, 2010) (finding that the ALJ failed to follow SSR 06-03p because he did not provide a explanation for his decision to reject a chiropractor's opinion); *Hatfield v. Astrue*, No. 3:07-cv-242, 2008 U.S. Dist. LEXIS 46702, at **7-8 (E.D. Tenn. Jun. 13, 2008) (noting that "[t]he Sixth Circuit … appears to interpret the phrase 'should explain' as indicative of strongly suggesting that the ALJ explain the weight [given to an 'other source' opinion], as opposed to leaving the decision whether to explain to the ALJ's discretion").

In his decision, the ALJ's only reference to the assessments of Ms. Pustotnik and Ms. Engelmann is a citation to their exhibit numbers in a parenthetical in his discussion of Claimant's traumatic past. Tr. 17. However, the ALJ did not address Ms. Pustotnik or Ms. Engelmann by name or otherwise discuss their opinions. In addition, the ALJ did not state or explain what weight he gave to their opinions, if any, or discuss why he disregarded this evidence.

The mere citation to the opinions of Ms. Pustotnik and Ms. Engelmann in a parenthetical is not sufficient to satisfy SSR 06-03p because it does not allow a subsequent reviewer to follow the ALJ's reasoning in disregarding these opinions, which might have had an effect on the outcome of the case. Indeed, Ms. Pustotnik's and Ms. Engelmann's assessments provide insight into the severity of Claimant's impairments because they worked closely with her and experienced many of her symptoms first hand, as evidenced in their treatment notes. Based on this knowledge, Ms. Pustotnik concluded that Claimant had **extreme** limitations in maintaining social functioning and in interacting appropriately with the general public. Tr. 370 (emphasis added). Ms. Engelmann opined that Claimant had marked limitations in the same category. Tr. 368. In addition, both Ms. Pustotnik and Ms. Engelmann affirmed that they observed Claimant exhibit thoughts of suicide. Tr. 367, 369. Ms. Pustotnik stated that she heard Claimant's suicide threats and witnessed her violent acts against her brother. Tr. 370. Plaintiff was prejudiced by

23

the ALJ's failure to discuss how he evaluated these opinions because they directly relate to at least two of the domains of functioning (Domain 3-interacting and relating with others and Domain 5-caring for herself).  As discussed above, a finding of an "extreme" limitation in one domain or of "marked" limitations in two domains will qualify a minor claimant as disabled.

In regard to the domain of interacting and relating with others, Ms. Pustotnik's opined that Claimant had extreme limitations in maintaining social functioning and in interacting appropriately with the general public.  The regulations set forth examples of limitations in this domain, including that a child has difficulty communicating with others.  20 C.F.R. § 416.926a(i)(3)(v).  Ms. Pustotnik's opinion might have altered the ALJ's ultimate conclusion as to Claimant's level of impairment under this domain because it indicates that Claimant has extreme difficulties in communicating with others.  The ALJ's failure to explain what weight he gave to this opinion or what impact it ultimately had on his decision was prejudicial to Plaintiff.

In regard to the domain of caring for herself, both Ms. Pustotnik and Ms. Engelmann affirmed that they observed Claimant exhibit thoughts of suicide.  Under the regulations, an example of a limitation in this domain is that a child engages in "self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take [the child's] medication) or [the child] ignore[s] safety rules."  20 C.F.R. § 416.926a(k)(3)(iv).  It is undisputed that Claimant attempted to commit suicide on several occasions (Tr. 398, 403, 445, 447, 449), and both case managers observed Claimant exhibit suicidal thoughts.  However, the ALJ does not mention this behavior or discuss this evidence in reaching his decision that Claimant has only less than marked limitation in this domain.  Tr. 22.  Instead, the ALJ simply cites to Plaintiff's testimony that Claimant sometime needed help with her hygiene. Tr. 22.  The ALJ's complete failure to discuss

24

this evidence or the impact it had on his final conclusion was also prejudicial to Plaintiff.[7]

In sum, the ALJ committed procedural error by failing to discuss properly the opinions of Ms. Pustotnik and Ms. Engelmann in his decision, which, in turn, denotes a lack of substantial evidence. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009). Because of the ALJ's failure sufficiently to discuss these opinions, the Court cannot ascertain his reasoning in reaching his ultimate conclusion regarding Claimant's level of impairment, which deprives the Court of its ability to conduct meaningful judicial review of this determination. Accordingly, the Court should reverse the Commissioner's decision and remand the instant case so that the ALJ can properly consider and discuss the opinions of Ms. Pustotnik and Ms. Engelmann.

**B.     Plaintiff's Remaining Arguments**

In her next argument, Plaintiff asserts "the ALJ erred in failing to take into account the multitude of intensive psychiatric supports required by [Claimant] in order to stabilize her fragile mental state and moderate her symptoms and limitations." Doc. 21-1, pp. 6-8. In the ALJ's decision, he states in boilerplate fashion that he reached his decision after "reviewing all of the evidence" (Tr. 12), after "careful consideration of the entire record" (Tr. 15), and after "considering the evidence of record." Tr. 16. However, the ALJ does not mention any of the treatment notes or reports from any of the health care agencies that provided treatment to Claimant. This evidence would also qualify as evidence from "other sources." Because remand is appropriate for the reasons set forth above, the ALJ, on remand, should also consider and discuss evidence from "other sources" in accordance with SSR 06-03p.

In her final argument, Plaintiff asserts that "the ALJ erred in failing to consider all of the evidence of record, as well as [Claimant's] longitudinal history, in determining the level of

---

[7]  In her final argument, Plaintiff asserts, *inter alia,* that substantial evidence does not support the ALJ's finding of less than marked limitation under the domain of caring for herself. Doc. 21-1, p. 10. On remand, the ALJ should consider the evidence of Claimant's past self-injurious behavior in reaching his decision on the domain of caring for herself.

limitation she has in the domains of acquiring and using information, caring for herself, and health and physical well-being." This Report and Recommendation does not address that argument because, on remand, the ALJ's evaluation of evidence from "other sources" may impact his findings under the six domains. *Trent v. Asture*, Case No. 1:09CV2680, 2011 U.S. Dist. LEXIS 23331, at *19 (declining to address the plaintiff's remaining assertion of error because remand was already required and on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).

### VII. Conclusion and Recommendation

For the foregoing reasons, the decision of the Commissioner should be REVERSED and the case REMANDED for further proceedings consistent with this Report and Recommendation.

Dated: November 22, 2011

_____
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).